## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| IN RE:<br><br>Application Pursuant to 28 U.S.C. § 1782 of SAINT-GOBAIN ADFORS S.A.S.<br><br>       Petitioner,<br><br><br>    To take discovery of –<br><br><br><br>3M COMPANY<br><br>      Respondent. | Misc. Case No. XX-mc-XX<br><br>**DECLARATION OF ALEXANDER JOHN DIEBLER WILSON IN SUPPORT OF APPLICATION OF SAINT-GOBAIN ADFORS S.A.S. FOR AN ORDER TO TAKE DISCOVERY FOR USE IN FOREIGN PROCEEDINGS PURSUANT TO 28 U.S.C. § 1782** |

I, Alexander John Diebler Wilson, a solicitor admitted to practice in England & Wales, declare under penalty of perjury as follows:

1.      I am a member of the law firm of Powell Gilbert LLP.

2.      I submit this Declaration in support of the application of Saint-Gobain Adfors S.A.S. ("Saint-Gobain") for an order pursuant to 28 U.S.C. § 1782 ("Section 1782") to conduct limited discovery from 3M Company ("3M") for use in a proceeding in The High Court of Justice, Business and Property Courts of England & Wales (the "High Court").

3.      I studied law at the College of Law, London and qualified as a solicitor in 1996.

4.      In 2007, I qualified as a solicitor advocate, which is the title used for a solicitor who is qualified to represent clients as an advocate in the higher courts in England and Wales.

5.      Having practiced as a specialist patent litigator for 20 years in that jurisdiction, I am very familiar with the rules of civil procedure and the conduct of patent litigation before the English courts.

6.      In my practice, I appear regularly before the Patents Court, a specialist division of the High Court, as well as the appellate courts.

**BACKGROUND**

*Patents and the parties*

7.      A patent is a monopoly right which protects an invention for a period of 20 years. In Europe, patents can be granted either centrally by the European Patent Office or

by a national patent office such as the UK Intellectual Property Office. Whichever route is used, the requirements which the patent must satisfy are the same.  The underlying principle of patent systems around the world is that an inventor is granted a limited monopoly right in exchange for publishing his or her invention. As part of this bargain, the inventor must fully set out in the patent application a written description of its alleged invention, usually along with explanatory figures and drawings. In simplified terms, the requirements for a valid patent include that at the relevant priority date (as I explain further below) the invention claimed must be:

> a) **Novel** (i.e. not have been disclosed either in written or physical form before);
>
> b) **Non-obvious** (i.e. not be obvious over what was known in the field); and
>
> c) **Sufficient** (i.e. clearly described and containing enough information to allow someone skilled in the field to understand and work the invention across its full scope without undue effort).

8.     The sufficiency requirement is an important part of the bargain: it ensures that, after the end of the monopoly period, other researchers and competitors are able to make full use of the invention and progress the technology further. The scope of protection of a patent is defined by its claims, which are found at the end of the patent document.

9.     Under English law any person can bring an action before the court seeking a finding that a patent is invalid (i.e. should not have been granted, for example, because

it fails to fulfil one or more of the criteria described above) and an order for its revocation.

10.     Saint-Gobain has commenced such a revocation action ("Action") in respect of European Patent EP(UK)2373755 ("EP 755") in the Patents Court, a specialised court within the High Court that hears patent disputes in England and Wales. A copy of the Grounds of Invalidity commencing that action is attached as Exhibit A, and a copy of EP 755 is attached as Exhibit B.  3M Innovative Properties Company ("3M IPC") is the registered proprietor of EP 755 at the UK Intellectual Property Office, and therefore is the defendant to the Action.  Indeed, that is the **only** entity against which such a claim could have been brought.  It appears that 3M IPC is the main company with responsibility for the management of the 3M group's IP portfolio. However, it does not appear that 3M IPC is responsible for underlying research and development, and the research which gave rise to EP 775 appears to have been undertaken by a different 3M entity.

*EP 755*

11.     EP 755 was applied for in November 2009, and was granted in July 2018. However, the relevant date from which 3M IPC claims its priority (the Priority Date—the date when its validity should be judged) is 17 December 2008. The patent concerns abrasive particles (i.e. small ceramic particles used in abrasive sheets, discs etc.)  A particular feature of the claimed invention is that the particles are dish-shaped, and meet certain parameters with respect to their shape and dimensions as set out in the claims of

EP 755 (for example, one requirement is that the ratio between the width at the corners to the width at the thinnest interior point is between 1.25 and 5.00).

12.    EP 755 contains a number of worked examples. Examples 1 and 2 relate to manufacturing two types of abrasive particle which are said to embody the invention claimed, and Example 3 is meant to provide a comparison—the inventors claim to have manufactured abrasive particles that were described in a public document from around 15 years earlier (referred to as "Rowenhorst") to serve as a comparison.  Rowenhorst is also a prior art[1] document relied upon by Saint-Gobain in the Action, and is in fact a 3M patent, published in 1994, which relates to shaped abrasive particles. A copy of this patent, U.S. Patent No. 5,366,523, and its reissued patent, RE 35,570, are attached as Exhibits C and D respectively.

13.    Rowenhorst also contains examples which describe a process by which abrasive particles were made, but does not provide detailed images of the resulting particles, or contain a description of the particles in terms which can be directly compared to the requirements of the claims of EP 755 (i.e. regarding shape and dimensions). However, under English law a patent claim will be invalid for lack of novelty if the result of performing a **process** described in a prior art document would have been a **product** with all the features of that claim. Saint-Gobain believes that is

---

[1] "Prior art" is a term used for a public disclosure which pre-dates a patent's Priority Date and is used as a basis to argue that the patent in question was not novel and/or was obvious, and so should be revoked. Prior Art can take the form of an earlier patent publication or any other document or even a physical thing such as a product, providing it was made available to the public.

precisely what has occurred in this instance: following the process described in

Rowenhorst leads to particles of the type claimed in EP 755, and so EP 755 is invalid in

light of Rowenhorst. Indeed Saint-Gobain believes that 3M, through 3M IPC, is trying to

extend its monopoly simply by describing a set of particles which would inevitably be

produced using the Rowenhorst process by reference to parameters of shape and

dimensions not mentioned in the Rowenhorst document itself.  This made it impossible

for the examiner at the European Patent Office to spot the lack of novelty, and essentially

ensured that EP 755 proceeded to grant. As the reissued Rowenhorst patent expired in

2012, such re-patenting strategy could lead to an extension of 3M's monopoly by a

further 17 years.

14.     In addition, Saint-Gobain is advancing an argument in the Action that EP

755 is not sufficient. The pleading, set out in Saint-Gobain's Grounds of Invalidity in the

Action, includes an allegation that the description in EP 755 does not provide sufficient

information to enable someone to reliably produce the particular abrasive particles

claimed (e.g. because Examples 1 and 2 described above do not actually contain

measurements of the particles produced). Thus, the reader is effectively presented with a

research project with no way to predict the results. In addition, Saint-Gobain alleges that

the parameters required in the claims (e.g. certain dimensions, ratios etc.) are unclear and

uncertain and that the ranges set out in the claims are so broad that products across their

breadth cannot be made.

### THE RELEVANCE OF THE DISCOVERY SOUGHT
### TO THE HIGH COURT PROCEEDINGS

*The categories of requests*

15.     The classes of documents that Saint-Gobain seeks fall into three categories:

(1) Requests for inspection of certain abrasive particles;

(2) Requests for disclosure of documents relating to the research

surrounding Rowenhorst; and

(3) Requests for disclosure of documents relating to the research

surrounding EP 755.

*Requests for inspection of certain abrasive particles*

16.     Saint-Gobain is seeking inspection of certain abrasive particles, namely:

(1) The particles made in accordance with Rowenhorst.

(2) The particles made in accordance with Example 3 of EP 755 (i.e.

purportedly following the description in Rowenhorst).

(3) The particles made in accordance with Examples 1 and 2 of EP 755

(which allegedly embody the invention of EP 755).

17.     With respect to the first two sets of particles, as mentioned above,

Saint-Gobain believes that following the process described in Rowenhorst leads to

particles of the type claimed in EP 755. Therefore, the abrasive particles that 3M obtained

when undertaking the Rowenhorst project, and when performing comparative Example 3

in EP 755 based upon Rowenhorst, are relevant to this issue. However, neither

Rowenhorst itself, nor Example 3 in EP 755, contain enough detail on their face to

compare the particles described to the claims of EP 755. Such a comparison could be

carried out by inspecting the particles concerned. As I have explained above, English law

allows for an invalidity attack based upon the performance of a process described in the

prior art. The point is neatly summarized in the often cited Court of Appeal decision of

*General Tire & Rubber Company v Firestone Tyre & Rubber Company Limited* [1972]

RPC 457,[2] which explained:

> *If the prior inventor's publication contains a clear description of, or
> clear instructions to do or make, something that would infringe the
> patentee's claim if carried out after the grant of the patentee's
> patent, the patentee's claim will have been shown to lack the
> necessary novelty.*

18.    Accordingly, the particles obtained when undertaking the projects are

highly relevant.  If, on inspection, they are found to fall within the claims of EP 755, then

EP 755 will be invalid.

19.    It is clear from submissions made by 3M IPC in proceedings regarding EP

755 against another party that the original Rowenhorst particles were still stored by 3M at

least until 22 January 2019.[3]  I have no reason to believe that the later produced

Rowenhorst particles from example 3 of EP 755 would not also be stored by 3M.

Moreover, it is clear that 3M itself has presented its analysis of the Rowenhorst particles

as a dipositive issue of fact. Whilst Saint-Gobain does not accept 3M's conclusions, the

submissions by 3M illustrate the relevance of the Rowenhorst particles to this matter.

---

[2] A copy of the decision is attached as Exhibit E.

[3] See paragraph 6 of Affidavit of Dwight D Erickson of same date submitted to EPO, a
copy of which is attached as Exhibit F.

20.     The third set of particles are those described in Examples 1 and 2 of EP 755 – i.e. the abrasive particles that are said to embody the invention. As explained above, despite the claims of EP 755 containing a number of parameters concerning the shape and dimension of the abrasive particles, Examples 1 and 2 do not actually disclose the measurements of the particles in these respects. Saint-Gobain is advancing an invalidity challenge on the basis that EP 755 does not provide sufficient information to allow someone to work the invention, so it is relevant to understand the nature of the particles that 3M manufactured in the examples, which are said to support the claimed invention.

21.     In this respect, a recent case of *Akebia Therapeutics Inc v Fibrogen Inc* [2019] EWHC 1943 (Pat)[4] concerned an invalidity action against a patent which protected a number of compounds said to have a particular medicinal effect. One of the grounds of invalidity raised was that the patent was insufficient *inter alia* on the basis that the reader was presented with a research project. In relation to disclosure, the claimant had already obtained documents pursuant to a Section 1782 request in the United States relating to contemporaneous testing carried out by the patentee on a variety of compounds. The parties agreed (and the court approved) that these documents could form part of the documents for disclosure in the UK action.[5] In the same way in this

---

[4] A copy of the decision is attached as Exhibit G.

[5] The Section 1782 request had not been made in support of the UK action. Therefore, I understand Akebia did not have the right to introduce those documents, but the parties came to an agreement.

Action, Saint-Gobain's request for samples evidencing what 3M actually did would be of assistance in respect of the insufficiency pleading.

***Requests for disclosure of documents relating to the research surrounding Rowenhorst***

22.    In addition to inspection of the particles made according to the Rowenhorst project in the early 1990s, Saint-Gobain is requesting disclosure of associated documents.

23.    Documents relating to how the Rowenhorst particles were made (and in particular whether that process corresponds to the written description in Rowenhorst) would be of considerable assistance in understanding the data that could be obtained from inspection of the associated particles. Moreover if, as appears to be the case, Rowenhorst and EP 755 were part of the same 3M research project, then documents relating to the Rowenhorst project have a strong potential to inform the research that 3M undertook in relation to EP 755.

***Requests for disclosure of documents relating to the research surrounding EP 755***

24.    For the same reason as the documents relating to the research surrounding Rowenhorst, documents explaining how 3M undertook designing and performing the examples described in EP 755 are clearly relevant, and would be necessary to understand the data that could be obtained by inspecting the associated sample particles.

25.    Also, as noted above, as part of its sufficiency attack, Saint-Gobain alleges that the parameters required in the claims are unclear and uncertain. Documents relating to how 3M settled upon these parameters, and undertook the measurements to calculate

these parameters, are all potentially relevant to this question.  In a similar manner, as

Saint-Gobain specifically alleges that EP 755 does not contain sufficient information to

allow someone to reliably produce the claimed particles, documents relating to 3M's

research into the manufacturing conditions required to obtain particles with such

parameters are of potential relevance. As I have explained above, the Patents Court is

receptive to considering contemporaneous documents in the context of considering

insufficiency—for example, if the inventors had had difficulties making the particles or

devising the test set out in the claims, this would be relevant to the pleaded insufficiency

case.

### THE LIMITED AVAILABILITY OF
### DISCOVERY IN THE HIGH COURT

26.     The procedure for the provision of discovery and evidence in the High

Court proceedings is governed by the English Civil Procedure Rules. As a common law

jurisdiction, the English courts do impose obligations on the <u>parties</u> to proceedings to

preserve and disclose certain documents in the context of proceedings. These obligations

would be recognizable to lawyers from other common law countries such as the US, but

there are significant differences compared to, for example, US discovery. The procedure

by which a party to proceedings may be required to provide documents in the UK is

known as "disclosure" and has similarities to, but also considerable differences from

US discovery.

***Non-party documentary discovery***

27.     When providing documentary disclosure, a party's obligation is limited to those documents which are or have been in its "control," defined by reference to (i) being in possession of a document, (ii) having a right to take possession, or (iii) having a right to inspect/take copies. As I explained above, Saint-Gobain believes that the 3M IPC (the defendant in the UK action) does not have responsibility for research and development within the 3M group, and so is unlikely to be in physical possession of relevant documents or samples itself (rather, these will be within 3M's control). Therefore, before considering the scope of disclosure available in the UK (which I do below), it is relevant to consider if it is likely that Saint-Gobain could obtain documentary disclosure from any entity other than 3M IPC.

28.     The Patents Court has dealt with the question of control of documents between companies within a corporate group in *Schlumberger Holdings Limited v Electromagnetic Geoservices* [2008] EWHC 56 (Pat).[6] In that case, the judge found that the fact that a company could request documents from other companies within its group does not make those documents within its control, because that the request could be refused. That case turned on the fact that the factual evidence revealed that in that particular case "*the [claimant] has already enjoyed, and continues to enjoy, the co-operation and consent of the third party to inspect his documents and take copies.*" However, there is no such evidence with respect to 3M in this instance.

_____

[6] A copy of the decision is attached as Exhibit H.

29.     Whilst the Civil Procedure Rules include a mechanism to seek documentary disclosure from a non-party (CPR 31.17), this brings significant jurisdictional challenges when the non-party is outside of the jurisdiction (as is the case with respect to 3M). Again, the judge in the *Schlumberger* case noted:

> *There is no application before me for disclosure directly against those [other companies in the Schlumberger group]. Companies are not within the jurisdiction and it would appear, therefore, that there is no scope for applications for third party disclosure under the appropriate provision of Part 31.*

In any event, the power to order non-party disclosure is discretionary, and the threshold to obtain such a non-party disclosure order even for parties within the English court's jurisdiction is high.  In particular, the court would need to be satisfied *inter alia* that disclosure from a non-party is **necessary** to dispose fairly of the claim or to save costs. In *Flood v Times Newspaper Ltd and Commissioner of Met Police* [2009] EWHC 411 (QB),[10] it was noted that "*In any event, the court has a clear obligation to ensure, if necessary of its own motion, that this intrusive jurisdiction is not used inappropriately*" and a request for non-party category-based disclosure did not pass the necessity test under CPR 31.17. This accords with my experience that such applications are rare, and even when granted are usually very narrow in scope.

30.     Therefore, even if the Patents Court did (contrary to my expectations as explained further below) order documentary disclosure along similar lines to the requests made here by Saint-Gobain, there is a real risk that Saint-Gobain would not be able to

---

[6] A copy of the decision is attached as Exhibit I.

obtain documents as these would be held by other companies in the 3M group that could

not be compelled to produce these by the English Court.

***Approach to documentary discovery in the High Court (and specifically the Patents Court)***

31.     Since 1 April 2013, the Civil Procedure Rules have continued what is often

referred to as a "menu" of options for the court to consider in relation to disclosure.

CPR 31.5(7) states that at the first case management conference the court **will** decide

upon the appropriate order for disclosure, reflecting the fact that in all instances the court

controls disclosure. There are five options listed in CPR 31.5(7),[7] the widest of which is

an order is for "standard disclosure."[8] This requires parties to disclose documents which

"(i) adversely affect his own case; (ii) adversely affect another party's case; or

(iii) support another party's case," as identified by undertaking a "reasonable search."

Accordingly, it is not normal to disclose documents on a "chain of enquiry" basis, and the

mere potential to be of assistance to the court is not enough to make a document

disclosable. The remaining "menu" of disclosure options are progressively narrower, with

one of the options being for the court to dispense with disclosure entirely.

32.     Even where standard disclosure has been ordered in patent cases,

CPR Practice Direction 63 6.1(2) modifies standard disclosure with respect to disclosure

concerning the validity of a patent. This rule provides that, unless otherwise ordered, a

---

[7] The options are encouraged, but not prescriptive, as the court retains the power to deviate from these options.

[8] This is so named for historic reasons; despite its name, standard disclosure is by no means "standard."

party need only provide standard disclosure of documents that were created between two years before and two years after the priority date, the so-called "disclosure window."

33.     Recently, on 1 January 2019, the Business and Property Courts within the High Court (which includes the Patents Court) implemented a mandatory Disclosure Pilot Scheme for a period of two years, under which most of the usual disclosure rules are no longer applicable and are superseded by the Disclosure Pilot Scheme rules. Under the Pilot Scheme, a party seeking so-called "Extended Disclosure"[9] must obtain approval from the court, and the rules indicate that "*There is no presumption that a party is entitled to Extended Disclosure.*" Moreover, some of the listed Extended Disclosure models (for which approval is required) remain very narrow, including a model where a party is "*under no obligation to undertake a search for documents beyond any search already conducted for the purposes of obtaining advice on its claim or defence or preparing its statement(s) of case.*"

34.     Accordingly, the scope of disclosure that may be ordered is reasonably expected to be limited. Even where disclosure on validity is ordered in patent cases, as explained above, the starting position is that the patentee may limit searches for documents within two years either side of the priority date. This date range would not be comparable to Saint-Gobain's requests, and in particular would not cover the original period during which the research into Rowenhorst was carried out.

---

[9] Being any disclosure beyond "Initial Disclosure" which is provided upon issuing a claim or serving a defence, and is very limited and in particular carries no obligation to perform searches of any kind.

35.     I therefore believe it is very unlikely that disclosure comparable to Saint-Gobain's requests for documents would be available in the proceedings before the Patents Court.

**Inspection of samples, and inspection orders against non-parties**

36.     The provisions I discuss above are in relation to documentary disclosure under CPR 31. Whilst a document is defined widely as anything in which information of any description is recorded, this does not cover disclosure/inspection of objects such as the particles that Saint-Gobain seeks in this request.

37.     There are separate provisions of the Civil Procedure Rules which concern inspection of property. CPR 63 PD 4.5 states that "*In any proceedings in which the validity of a patent is challenged, where a party alleges that machinery or apparatus was used before the priority date of the claim the court may order inspection of that machinery or apparatus.*"  Although this relates to machinery/apparatuses, the principle could arguably be applied to inspection of products.

38.     However, in this instance it is unlikely that 3M IPC is in possession or control of the particles sought. Accordingly, the appropriate provision would be CPR 25.5, which provides that the court may make an order for inspection of property against a non-party. However, such an order is at the discretion of the court, and the burden to obtain an order against a non-party is high. Moreover, there is the added complication in this case that the 3M entity in possession of the particles is likely to be in the United States, as will be the particles themselves. The court has shown considerable

reluctance to exercise its powers against a non-party outside of the jurisdiction, and in

*Mackinnon v Donaldson, Lufkin and Jenrette Securities* [1986] CH. 482,[10] Hoffmann J

noted:

> *The content of the subpoena and order is to require the production by a non-party of documents outside the jurisdiction concerning business which it has transacted outside the jurisdiction. In principle and on authority it seems to me that the court should not, save in exceptional circumstances, impose such a requirement upon a foreigner, and, in particular, upon a foreign bank. The principle is that a state should refrain from demanding obedience to its sovereign authority by foreigners in respect of their conduct outside the jurisdiction. (emphasis added)*

39.    Although this case also arose in the case of a request for documentary

disclosure from a non-party outside the jurisdiction of the High Court, I believe this

observation is of general application and illustrates that the court would be highly

reluctant to order inspection of property against a non-party out of the jurisdiction and in

respect of property out of the jurisdiction.

40.    I therefore believe it is very unlikely that Saint-Gobain would be able to

obtain an order for inspection of the samples against 3M, which is not party to the

proceedings before the Patents Court.

**Hague Evidence Convention**

41.    For completeness, I note that the UK and US are both signatories to the

Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters

(the "Hague Evidence Convention"). Under this convention, a party can seek evidence

---

[10] A copy of the decision is attached as Exhibit J.

out of the jurisdiction, and this is achieved by the "home" court of the party seeking evidence sending a letter of request to the relevant foreign court. However, I do not believe this would be an appropriate route for Saint-Gobain to take because requests under the Hague Evidence Convention should generally be narrowly targeted.

42.     The English Court (at its discretion) typically gives effect to requests it receives by issuing an order under the Evidence (Proceedings in Other Jurisdictions) Act 1975. However, this states at section 2(4) that an order shall not require a party to provide documents other than "*particular documents specified in the order*" – i.e. not general disclosure. On the basis of reciprocity, it is unlikely that the High Court would expect a foreign court to give any broader effect to requests under the Hague Evidence Convention. In fact, as I note further below, the High Court is receptive to receiving documents obtained by way of Section 1782 requests, and does not generally require or expect parties to use other means (such as the Hague Evidence Convention).

## THE RECEPTIVITY OF COURTS IN THE UNITED KINGDOM TO EVIDENCE FROM THE UNITED STATES

43.     Courts in the United Kingdom have expressed their receptivity to discovery obtained in the United States through Section 1782 requests. In fact, in *South Carolina Ins. Co. v. Assurantie Maatschappij De Zeven Provincien N.V.* [1987] 1 AC 24,[11] the House of Lords (the highest judicial body at that time) expressly approved a private litigant's use of Section 1782 requests to gather evidence in the United States for use in English proceedings. Lord Brandon stated:

---

[11] A copy of the decision is attached as Exhibit K.

> *I cannot see that the [defendants], by seeking to exercise a right potentially available to them under the federal law of the United States, have in any way departed from, or interfered with, the procedure of the English court. All they have done is what any party preparing his case in the High Court is entitled to do, namely to try to obtain in a foreign country, by means lawful in that country . . . evidence which they believe they need in order to prepare and present their case.*

44.     Likewise, in *Nokia v Interdigital Technology Group* [2004] EWHC 2920 (Pat),[12] the Patents Court, in a patent revocation action, confirmed specifically in relation to evidence obtained through the Section 1782 procedure, that "*the [UK] court is generally indifferent as to the source of admissible material*," and "*the [UK] court is not generally concerned as to how that evidence was obtained*." (paragraphs 23-24).

45.     In my experience, the use of Section 1782 discovery in support of English and other European patent litigation is not unusual. I have been involved in a number of such cases in which this procedure has been used. The scope of documentary disclosure under English procedure norms is more limited than the United States (as I understand these), but that does not mean that documents which go beyond what might normally be disclosable under English Civil Procedural Rules are not admissible, especially where, as in this case, they are likely to be of relevance to the issues before the court.

46.     Overall, I believe there is absolutely no reason to suspect that the Patents Court would be unreceptive to the evidence that Saint-Gobain seeks.

---

[12] A copy of the decision is attached as Exhibit L.

## THE NON-EXISTENCE OF FOREIGN PROOF-GATHERING
## RESTRICTIONS IN THE UNITED KINGDON

47.     There is no restriction or policy that would prohibit the Patents Court from accepting support from foreign courts or authorities.  Courts in the United Kingdom broadly admit evidence.  Submitting evidence gathered through Section 1782 discovery will not violate any restriction or policy concerning the civil procedure of the United Kingdom. English courts have long accepted evidence obtained via foreign proceedings, such as the mechanism set out in Section 1782.  It is only in exceptional circumstances, such as where the evidence duplicates a party's trial evidence, or where the evidence requires large scale investigations, or the reopening of trial, that English courts have refused to admit evidence obtained by means of Section 1782 on the grounds that the application might be an abuse or unconscionable.  However, English courts have considered applications abusive only in very limited circumstances.

48.     I do not see any proper basis under English law for suggesting that the applicant's present request for discovery via Section 1782 requests is unconscionable or abusive.

49.     The Patents Court is especially experienced in considering evidence obtained by means of Section 1782 requests and, to my knowledge, has never refused to admit any documents obtained by Section 1782 requests.  Accordingly, in light of the above, it is very likely that the Patents Court would admit and give due weight to any evidence produced by this application that is relevant to the issues in the UK proceedings.

### PROTECTION OF CONFIDENTIALITY BY THE HIGH COURT

50.     The English Civil Procedure Rules and court practice provide for the protection of confidential information. During the course of proceedings and prior to trial, confidential information can be protected by way of a so-called "confidentiality club," similar to a protective order that limits the individuals who are able to have access to particular documents, or classes of documents, and sets out the restrictions on their use (both during the course of the proceedings and following their conclusion). The terms of a confidentiality club are usually agreed upon by the parties, but are usually also recorded in a court order. Accordingly, breach of the terms of the confidentiality club can amount to contempt of court, which in serious cases brings with it criminal sanctions.

51.     In my experience, confidentiality clubs are routine in patent cases, and the Patents Court Guide (a document issued by the Patents Court setting out specific rules and procedure for patent matters) states that "*It is often the case in patent cases that one or both parties disclose documents which they are only willing permit inspection of on terms as to confidentiality. Parties should endeavour to agree confidentiality clubs and agreements*" and even provides specimen confidentiality agreements.[13] If the parties are unable to agree on the operation of a confidentiality regime, the court can make an appropriate order. To give an example of a recent case from November 2019, in *J.C. Bamford Excavators Limited v Manitou UK Limited* [2019] EWHC 3071 (Pat),[14] a dispute arose over the confidentiality of a document and the individuals who should be

---

[13] A copy of the guide is attached as Exhibit M.

[14] A copy of the decision is attached as Exhibit N.

provided access. The court agreed to the disclosing party's position that circulation of the unredacted version of the document should be limited to external counsel, the testifying independent expert, and two named in-house legal counsel of the receiving party under the terms of the confidentiality club imposed, and refused to permit the receiving party's request to additionally allow two named internal technical staff to receive unredacted copies.

52.     As to hearings, the court is able to hold (usually relevant parts of) proceedings in private and will, in appropriate cases, designate parts of transcripts and judgments as confidential. The Patents Court Guide also states that with respect to confidential documents supplied to the court for trial:

> *The preferred practice is that sections of a document which contain confidential information are contained in a separate confidential annex or exhibit, which is placed in the separate confidential bundle. In some cases, where this is not feasible, the party serving a document should provide a redacted version to go in the main bundle, and include a full version containing the confidential material (highlighted or underlined), or at least particular sections containing the confidential information, for inclusion in the confidential bundle.*

53.     This practice of maintaining a separate bundle of confidential material allows the parties and the court to easily keep track of confidential information during the course of trial, and also allows for the contents of the confidential bundle used at trial to be easily identified in an order protecting its confidentiality (as an exception to the normal rule that documents placed before the court are public).

54.     By using the procedures discussed above, the confidentiality of information obtained through Section 1782 discovery will be effectively protected in litigation pending before a court in the United Kingdom.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 2nd day of July 2020 at London, England.

_____

Alexander John Diebler Wilson